In re Leonard J. SICILIANO,
Debtor (Two Cases).

Bankruptcy Nos. 91–16378DAS,
93–12752DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 5, 1994.

Leonard J. Siciliano, pro se.

Jerome R. Balka, Philadelphia, PA, for Prudential Sav. Bank.

Edward Sparkman, Philadelphia, PA, Standing Chapter 13 Trustee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA (U.S. Trustee).

### OPINION

DAVID A. SCHOLL, Chief Judge.

#### A. INTRODUCTION

In an appeal of our Order, affirmed by the District Court, denying Prudential Savings Bank ("Prudential") retroactive relief from the automatic stay in Bankr. No. 91– 16378DAS, the second Chapter 13 bankruptcy case ("the 2d Case") filed by LEONARD J. SICILIANO ("the Debtor"), the Third Circuit Court of Appeals ("the Court"), in a decision reported as *In re Siciliano,* 13 F.3d 748 (3rd Cir.1994) ("*Siciliano I* "), reversed and remanded the matter to reconsider whether the automatic stay should be annulled as to Prudential, expressing particular concern with whether Prudential could prove that it was entitled to relief pursuant to 11 U.S.C. § 362(d)(2). As a result, we have before us Prudential's request for relief pursuant to the remand in the 2d Case ("Prudential's Motion I").

However, apparently unknown to the Court, this court presently had before it at the time of its decision in *Siciliano I,* and continues to have before it, the fourth Chapter 13 bankruptcy case ("the 4th Case") filed by the Debtor, in which the Debtor achieved confirmation of a plan. Also, we have before us (1) the Debtor's "Motion for My Request for a Hearing to Prove All Illegal Acts performed by Prudential's Bank and Their [sic] Attorney Jerome Balka" ("the Debtor's Motion"); and (2) the Motion of Prudential Savings Bank, PaSA to Dismiss Debtor's Fourth Bankruptcy Petition (No. 93–12752) for Cause Pursuant to Bankruptcy Code Section 109(g) and/or for Failure to Comply with Bankruptcy Rule 9011 and to Bar Debtor from Filing Future Bankruptcy Petitions for 180 Days Without Court Approval or in the Alternative for Relief from Automatic Stay ("Prudential's Motion II"). These three matters were heard together and our task is to provide a global resolution of these matters.

We conclude, as to Prudential's Motion I, that Prudential has failed to meet its burdens of proof under either § 362(d)(2)(A) or § 362(d)(2)(B), and therefore we must again deny it the relief of stay annulment which it sought in the 2d Case. Furthermore, because Prudential has failed to meet its heavy burden of proving fraud on the part of the Debtor in achieving confirmation of a plan in the 4th Case, we will neither dismiss the 4th Case nor revoke our Order confirming the Debtor's plan in that case. Because Prudential has no claim nor apparent role in the 4th Case at present and the Debtor was unable

to prove any actionable conduct on the part of Prudential or its attorney, we will deny the Debtor's Motion. However, acting upon requests implicit within, but not clearly articulated in, Prudential's Motion II and in order to prevent further inevitable and (very likely) misdirected litigation between these parties in this court, we will provide a blueprint for a potential final resolution of this controversy. Prudential shall be directed to set aside the conveyance to it; the Debtor shall be directed to file an amended plan including treatment of Prudential's claim thereafter; and if the Debtor is unable or unwilling to do so, the 4th Case will be dismissed with prejudice.

## B. FACTUAL AND PROCEDURAL HISTORY

The Debtor and Prudential have been engaged in protracted litigation which has spanned the Court of Appeals, this court, and the state courts for over five years and four bankruptcies. Although the procedural history of this litigation is extensive, the underlying facts which the parties apparently believe are crucial and that they continually both regurgitate in their pleadings occurred in 1989 and are not seriously in dispute.

On September 4, 1984, Prudential extended a $17,000 loan to the Debtor secured by his home located at 2027 South 24th Street, Philadelphia, Pennsylvania ("the Property"). As a result of an injury which caused an interruption to his employment as a steamfitter, the Debtor fell behind on his mortgage payments. On January 19, 1989, Prudential sent a Notice of Intention to Foreclose, pursuant to 41 P.S. § 403, to the Debtor ("the Notice"), advising that payment of a $694.43 delinquency within thirty (30) days was required to avoid foreclosure. Apparently not having received a satisfactory response to the Notice, Prudential, on May 31, 1989, filed a mortgage foreclosure complaint against the Debtor in reference to the Property in the Philadelphia Court of Common Pleas ("the State Court"). In an apparent self-help attempt at a resolution, the Debtor negotiated directly with a high-ranking employee of Prudential in July, 1989. He claims that this employee told him that he would have to pay

$1,600 to avoid foreclosure at that point. He paid $1,000 and promised to return with the $600 balance in "five or six weeks." However, when he returned with $600, apparently within that timeframe, he was now told by the same employee that, in addition to the $600, he would be obliged to pay $1,200 towards fees (and possibly costs incurred) by Prudential's attorney, Jerome R. Balka, Esquire ("Balka"), in the State Court foreclosure case. The Debtor pretty much ends his story of "illegal acts" at this point, apparently believing that his point of subjection to extortion at the hands of Prudential or Balka has been made out. We infer that the $1,200 and probably also the $600 were not paid to Prudential. To observe that the Debtor took the actions of Balka, who continues to represent Prudential, personally is an understatement.

At this juncture, we observe that the Pennsylvania legislature has addressed the issue of preventing excessive demands of attorney's fees and costs to serve as a barrier to cures of residential mortgages in 41 P.S. §§ 403–06. Specifically, per 41 P.S. § 406(3), attorneys' fees demanded must be reasonable and actually incurred and are limited to $50 within thirty days after dispatch of a notice pursuant to 41 P.S. § 403. However, the Debtor apparently failed to plead any defenses, including violations of the foregoing laws, in his defense in the State Court. A judgment was therefore entered in favor of Prudential on September 5, 1989, in the amount of $19,838.99. A sheriff's sale of the Property in execution upon this judgment was initially scheduled for December 4, 1989.

On Friday, December 1, 1989, the Debtor filed his first Chapter 13 bankruptcy case. As a result of the automatic stay which was effected upon the filing of that bankruptcy petition, the sheriff's sale was stayed. After the Debtor failed to make several post-petition mortgage payments, Prudential filed a motion for relief from the automatic stay in that case on February 19, 1991. The parties settled the relief motion by entering into a stipulation, which was approved by our Order dated April 4, 1991. Pursuant to the stipulation, Prudential was entitled to request that it be given relief from the automatic stay

after five days notice of default and certification to this court if the Debtor defaulted one more time on his mortgage obligation. The Debtor subsequently missed a mortgage payment and, after proper notice and certification, we granted Prudential relief from the stay on June 20, 1991, permitting it to continue its State Court foreclosure proceeding.

The sale of the Property was again scheduled by the sheriff pursuant to the foreclosure judgment, this time for December 2, 1991. Meanwhile, the Debtor's first bankruptcy had been dismissed on November 7, 1991, because of his failure to also make payments to the Chapter 13 Trustee. Again, three days before the scheduled sheriff's sale, the Debtor filed the 2d Case. However, because proper notice of the 2d Case filing was not provided to Prudential or the sheriff's office prior to December 2, 1991, the sheriff's sale of the Property was conducted as scheduled on that day and the Property was sold to Prudential. Prudential learned of the 2d Case when Balka noted its listing in *The Legal Intelligencer* on December 4, 1991. The sheriff's department received notice from the Debtor one day later. Neither the sheriff's department nor Prudential took any steps to invalidate the sale once they learned of the pendency of the 2d Case.

On December 23, 1991, Prudential filed a motion for relief from the automatic stay in the 2d Case. Before Prudential's relief motion could be heard, however, the 2d Case was dismissed by our Order dated January 6, 1992, because of a rather technical but nevertheless significant deficiency, *i.e.*, the Debtor failed to file a proper mailing matrix of creditors. The Debtor then filed a "Request for Opportunity to File Chapter 7" in the 2d Case, which we treated as a motion to reconsider the dismissal ("the Reconsideration Motion"). A hearing was scheduled on March 3, 1992, on the Reconsideration Motion, and notice of the hearing was sent to all parties by the bankruptcy clerk's office. Only the Debtor and the Chapter 13 Trustee attended the hearing. Prudential later denied that it had received notice of the hearing from the clerk. By Order dated March 4, 1992, we denied the Reconsideration Motion. We noted, in that Order, that the Debtor could refile

any bankruptcy case he wished and that any sale of the Property on December 2, 1991, was void because the automatic stay from the 2d Case was then in place.

On March 13, 1992, Prudential's Motion I was originally filed, seeking the reconsideration of our dismissal Order and retroactive relief from, or annulment of, the automatic Stay. The Debtor filed a response on April 1, 1992, and a hearing was conducted on April 9, 1992. Prudential brought several witnesses to the hearing and offers of proof were provided for each. The Debtor also testified on his own behalf. At this time, we learned that the Debtor had filed a third Chapter 13 bankruptcy case. On April 10, 1992, we filed an Order and Memorandum, reported only at 1992 WL 77755 ("the April Order") in which (1) we rejected Prudential's argument that it did not receive notice of the hearing on the Debtor's Reconsideration Motion from which our March 4, 1992, Order arose because the presumption of the clerk's dispatch of the notice had not been rebutted, also noting that the hearing had been listed in the *Legal Intelligencer,* which Balka's statement that he discovered the filing of the 2d Case by reading suggests that he reviews carefully; (2) we rejected Prudential's argument that the sale was voidable and not void, citing *Maritime Electric Co. v. United Jersey Bank,* 959 F.2d 1194, 1206–07 (3rd Cir.1992); and *In re Schwartz,* 954 F.2d 569, 573 (9th Cir.1992), noting that the latter decision reversed *In re Schwartz,* 119 B.R. 207 (Bankr. 9th Cir.1990), upon which Prudential relied; and (3) we declined to annul the stay on the basis of the Debtor's alleged "bad faith." As to this third point, we stated as follows, 1992 WL 77755, slip op. at *1:

Although the Debtor expressed himself as a crude and belligerent individual who is probably doomed to self-destruction unless he obtains (and follows the advice of) learned bankruptcy counsel, we find no indicia of the traditional elements of bad faith. There is clearly no evidence of the sort of tactical, contrived maneuvers at play in *In re Albany Partners, Ltd.,* 749 F.2d 670, 671–783 (11th Cir.1984). The failure to provide notice to the Bank and the sheriff of the filing was certainly not intentional. The instant case was the

Debtor's second filing. His prior case continued for about two years, and some payments were apparently made; the instant case was dismissed only because the Debtor failed to timely file a mailing matrix. The fact that the Debtor has now filed a third case is not abusive, but a logical effort of the Debtor to try to save his home.

Prudential appealed this Order to the District Court. The District Court, in an affirmance Order of October 16, 1992, reiterated our conclusion that the foreclosure sale was void not voidable, citing *Maritime Electric*, and further stated as follows:

> Even assuming, without deciding, that retroactive relief from the say could be granted by annulling the stay, the bankruptcy court's finding that Siciliano did not act in bad faith was not clearly erroneous and the bankruptcy court did not abuse it's [sic] discretion by denying Prudential Saving Bank's request for annulment of the automatic stay.

Prudential then appealed the District Court's affirmance to the Court. In *Siciliano I*, the Court, on January 11, 1994, reversed and remanded the matter to the District Court with instructions to remand the matter to us for further proceedings.

Meanwhile, the Debtor's third bankruptcy case had been dismissed in December, 1992, because the Debtor, although making certain payments to Prudential, had failed to make his payments to the Chapter 13 Trustee. On May 5, 1993, the Debtor filed the 4th Case. Although Prudential was placed on the mailing matrix and acknowledged its awareness of the 4th Case by Balka's filing an entry of appearance in this case on May 13, 1993, it took no role whatsoever in the 4th Case until other events brought the parties together again.

The Debtor's plan in the 4th Case ("the Plan"), either by design (unlikely), oversight, or ignorance, makes no mention of or provi-

sion for Prudential. It contemplates payments of $200 monthly to the Trustee for 60 months, which might have been intended to be in lieu of payments to Prudential, which historically were $169/month. However, Prudential did not file a proof of claim, nor did the Debtor file one on its behalf. Because the Debtor was then making payments to the Trustee; no secured or priority proofs of claims in excess of the base amount to be paid were filed;[1] and no Objections to confirmation were filed by Prudential or any other party, the Plan was confirmed on September 23, 1993.

On November 18, 1993, the Debtor apparently attempted to shatter the deceptive calm following confirmation of the Plan by filing the Debtor's Motion before us. However, the Debtor's Motion was not initially listed for a hearing because he failed to serve it and the clerk's office (understandably, given its rough handwritten form) did not initially recognize it as a motion. When it was so recognized, the clerk sent out notices to interested parties, including Prudential, scheduling a hearing on February 8, 1994. Coincidentally, the District Court entered its Order remanding Prudential's Motion I to us for further proceedings in light of *Siciliano I* on February 4, 1994.

At a colloquy on February 8, 1994, Prudential and the Debtor agreed to try the remand hearing on Prudential's Motion I and the Debtor's Motion together. The Debtor requested a substantial continuance to allegedly attempt to obtain counsel. After the colloquy, we entered an interim Order on February 9, 1994, scheduling an April 5, 1994, hearing on remanded Prudential's Motion I and the Debtor's Motion. We expressed concern about the impact of the 4th Case confirmation Order upon the disposition of its Motion I on remand, and we directed the parties to file and serve any other motion related to the matters before us, such as a motion to attempt to revoke the confirmation Order, on or before March 7, 1994, to be heard with the

---

1. The claims docket in this case reveals that the only proof of claim filed was an unsecured claim in the amount of $2,891.49 by the Philadelphia Electric Company ("PECO"). it therefore appears that, in administration of the Plan, the Chapter 13 Trustee is obliged to distribute all of

the Debtor's plan payments to PECO. This development appears unfortunate for the Debtor, who needs to devote all of his financial resources to the mortgagees of the Property if he wishes to avert its loss through foreclosure.

other matters on April 5, 1994. Prudential's Motion II was filed in apparent response to this directive on March 7, 1994.

On April 5, 1994, having unsuccessfully attempted to continue the hearing for an imperceptible illness, the Debtor appeared without counsel. We conducted a sometimes strained, sometimes colorful, and often repetitious hearing on all three matters. At the close of the hearing, Balka handed up a Memorandum of Law arguing (1) the 4th Case was not filed in good faith and should be dismissed with prejudice, relying heavily upon *In re Oglesby*, 158 B.R. 602 (E.D.Pa. 1993) (*"Oglesby I"*); and *In re Huerta*, 137 B.R. 356 (Bankr.C.D.Cal.1992); and (2) the relief from the automatic stay granted in the Debtor's first bankruptcy case was *res judicata* and required entry for relief in the 4th Case, relying heavily on a lengthy quote from, again, *Huerta, supra*, 137 B.R. at 373–74.

## C. DISCUSSION

### 1. THE DENIAL OF PRUDENTIAL'S MOTION I MUST BE REINSTATED, BECAUSE PRUDENTIAL HAS FAILED TO ESTABLISH THE CRUCIAL ISSUE IDENTIFIED BY THE COURT OF APPEALS, i.e., THAT EITHER PRONG OF 11 U.S.C. § 362(d)(2) IS SATISFIED.

a. *The relief sought in Prudential's Motion I—annulment of the automatic stay—is extraordinary relief appropriate in only narrowly-defined circumstances.*

■ The thrust of the Court's Opinion in *Siciliano I*, as exemplified by the following passage, is that we could have annulled the stay, not that we were wrong for refusing to do so. Thus, the Court states, 13 F.3d at 751,

> we conclude that the bankruptcy court erred when it dismissed Prudential's motion for relief from the November 17, 1991, automatic stay as void, not voidable. Pursuant to section 362(d), the bankruptcy court had authority to grant an annulment of the stay. If it had done so, the postpetition sheriff's sale would have been vali-

dated as an exception to the void *ab initio* rule.

The premise of this conclusion is, at first blush, difficult to reconcile with the April Order, in which this court clearly considered the stay annulment issue and refused to grant such relief to Prudential. Indeed, although the Court acknowledged that we did in fact consider and reject Prudential's request that we annul the stay, *id.* at 750, the court utilizes the immediately subsequent passages of its Opinion to address the differences between annulling the stay and terminating the stay, thus emphasizing the point as if this court were unaware that there was authority to grant such "retroactive" stay relief. *Id.* at 750–51.

Therefore, the Court's Opinion appears more logically responsive to the District Court's concern, expressed in its Order of October 16, 1992, that any provision of retroactive relief from the stay by process of annulment was doubtful than to the contents of the April Order. It must be recalled that the District Court's Order, not the April Order, was the direct subject of the Court's review.

However, the foregoing passage of the Court's Opinion quoted two paragraphs above expressly states that "the bankruptcy court" erred in its analysis. We do not think that the Court remanded this matter to us simply to have us reiterate our previous treatment of the annulment issue, thereby engaging in the same analysis and, in all likelihood, arriving at the same conclusion regarding Prudential's entitlement to relief. Thus, we conclude, that the Court remanded the matter to this court not because we did not consider whether to annul the stay, but rather because it disagreed with our determination of that issue. The Court's charge on remand seems to bear this out:

> For the above reasons, we will remand this case to the bankruptcy court to determine whether this case meets the conditions of 11 U.S.C. § 362(d)(2)(A) or (B).... [U]pon Prudential's request for relief under § 362(d), the bankruptcy court must consider whether Siciliano had an equity in the property and if not, grant appropriate relief to Prudential. For the reasons stat-

ed above, appropriate relief could include annulling the stay and validating the sheriff's sale.

*Id.* at 752. It appears that the Court wishes us to determine whether the requirements of § 362(d)(2) are met and reconsider whether annulment of the stay would be proper in light of his conclusion. Thus, our charge on remand is to revisit the stay annulment issue, taking into particular account the issue of whether Prudential has satisfied the requirements for stay relief set forth in § 362(d)(2).[2]

Because of the importance of this issue, and because we believe that this mandate of the Court reopens the issue of whether annulment is appropriate, we will first discuss the body of cases which have explored the stay annulment issue generally and have helped to define the parameters of that rather narrow category of cases in which such relief has been deemed appropriate.

 When a court annuls the automatic stay for the benefit of a party in interest, it is as if the stay never existed for that particular party. *See In re Lampkin,* 116 B.R. 450, 453 (Bankr.D.Md.1990) ("The effect of annulling the stay is to negate its existence in its entirety."). This relief is quite extraordinary because it is retroactive, and, therefore, parties who secure such relief will have their previous actions, which may have violated the automatic stay at the time, validated after the fact. Annulling the stay is thus inconsistent with the notion that all debtors who seek the protection of bankruptcy in good faith are entitled to the "breathing spell" created by the automatic stay. Such extraordinary relief should therefore not be commonly available. If it were otherwise, the careful balance of benefits and burdens built into the Bankruptcy Code by Congress would be thrown off kilter.

There are a number of courts which have explored the stay annulment issue. Each court has articulated its own, slightly different set of parameters which define, for that

court, the universe of cases in which such extraordinary relief is appropriate. With few exceptions, however, most of these courts have acknowledged that annulling the stay is only appropriate in the rarest of circumstances. *See, e.g., In re Shamblin,* 890 F.2d 123, 126 (9th Cir.1989) ("Any equitable exception to the automatic stay [such as annulling the stay] should be narrow and applied only in extreme circumstances."); *Albany Partners, supra,* 749 F.2d at 675 ("[T]he important congressional policy behind the automatic stay demands that courts be especially hesitant to validate acts committed during the pendency of the stay."); *Scrima v. John Devries Agency, Inc.,* 103 B.R. 128, 135 (W.D.Mich.1989) ("annulment of an automatic stay is a radical form of relief"); *In re Jewett,* 146 B.R. 250, 252 (Bankr. 9th Cir.1992) ("Any such equitable exception to the automatic stay [*i.e.,* annulling the stay] should be narrow and applied only in limited circumstances."); *In re Barker–Fowler Electric Co.,* 141 B.R. 929, 936 (Bankr.W.D.Mich.1992) ("Annulment of the stay is an equitable remedy and should be applied only in extreme or extraordinary circumstances."); *In re Williams,* 124 B.R. 311, 316 (Bankr.C.D.Cal, 1991) ("The power to annul the stay must . . . be exercised sparingly."); and *In re Schewe,* 94 B.R. 938, 951 (Bankr.W.D.Mich.1989) ("Retroactive relief from the automatic stay may be ordered by a bankruptcy court in appropriate limited circumstances."). This court addressed the issue in *In re Boston Business Machines,* 87 B.R. 867, 871 (Bankr. E.D.Pa.1988), and we stated that annulling the stay is only appropriate in "a small category of situations."

Although we do not intend to create a laundry list of factors which, if present, warrant annulling the stay, it is helpful to review some of the common characteristics of those cases where the stay was annulled. Most courts will only annul the stay, which will validate a prior action taken by a creditor in violation of the stay, if such action was taken

---

**2.** We also note that the District Court, in its Order of February 4, 1994, stated that the matter was in turn remanded to this court "to determine whether [the Debtor] had an equity interest in the [P]roperty and if not, to grant appropriate relief under § 362(d)(2)(A), in accordance with

[*Siciliano I* ]." Despite the apparent conclusive significance given to the Debtor's equity indicated in this Order, the ultimate guidepost is the requirement that we proceed in accordance with *Siciliano I,* which we do not read as rendering the equity interest issue conclusive.

by a creditor without its knowledge of the debtor's bankruptcy filing. *See, e.g., In re Pinetree, Ltd.,* 876 F.2d 34, 37 (5th Cir.1989); *In re Formisano,* 148 B.R. 217, 225 (Bankr. D.N.J.1992); *Lampkin, supra,* 116 B.R. at 453; and *In re Tanksley,* 70 B.R. 429, 431 (Bankr.E.D.Mo.1987). *But see Albany Partners, supra,* 749 F.2d at 675 (stay annulled even though the creditor was aware of stay when it foreclosed on debtor's property). Furthermore, many courts will annul the stay only if the debtor is guilty of some inequitable conduct, such as abusive and/or repetitive bankruptcy filings. *See Albany Partners, supra,* 749 F.2d at 675 (stay annulled where debtor filed its petition in bad faith on the eve of foreclosure); *Williams, supra,* 124 B.R. at 316 (stay may be annulled to validate a foreclosure and "break a cycle of abusive, multiple bankruptcy petitions filed to hinder and delay creditors"); *Scrima, supra,* 103 B.R. at 135 (the court found no bad faith on the part of debtor and therefore refused to annul the stay); and *Schewe, supra,* 94 B.R. at 951 (same).

A scenario which has been found particularly conclusive to stay annulment is when the debtor either encourages a creditor to proceed notwithstanding the stay or lies in wait for the outcome of an action by one of its creditors and only asserts its status as a bankruptcy debtor after an unsatisfactory outcome becomes known. *See, e.g., Pinetree, supra,* 876 F.2d at 37 (stay annulled when debtor notified of foreclosure in advance and failed to assert its status as a bankruptcy debtor); *Williams, supra,* 124 B.R. at 316 (stay will be annulled in the case of the "'stealthily silent' debtor who continues actively to defend lawsuits, sometimes for years after filing a bankruptcy petition, without informing other parties or the court about the bankruptcy case until an adverse judgment is imminent"); *In re Oliver,* 38 B.R. 245, 248 (Bankr.D.Minn.1984) (stay annulled where the debtor took no steps to

enforce the automatic stay until after creditor had advertised the foreclosed property and sold it at a sheriff's sale).

In this vein, some courts have considered the expenses which a creditor will incur if it is forced to begin again its otherwise-void collection activities if the stay is not annulled.[3] *See Formisano, supra,* 148 B.R. at 225 (creditor would be required to spend more of her money if stay not annulled and tax sale voided); *In re Bresler,* 119 B.R. 400, 404 (Bankr.E.D.N.Y.1990) (court annulled stay in order to validate a commercially reasonable foreclosure sale and avoid the need to sell the property again); *Lampkin, supra,* 116 B.R. at 453 (requiring creditor to conduct another foreclosure sale would prejudice it and benefit no one); and *Tanksley, supra,* 70 B.R. at 432 (repetition of foreclosure sale would cost creditor needless expense).

Some of the factors recited in the foregoing cases are indeed present here. Prudential was apparently unaware of the 2d Case at the time it went forward with the sheriff's sale. As of the date of the hearing on Prudential's Motion I, the Debtor had filed three Chapter 13 cases, two of which had been dismissed.[4] Each filing stalled Prudential's State Court foreclosure proceedings at various pivotal junctures. Furthermore, the Debtor's post-petition loan payment history has been inconsistent at best. Once Prudential learned of the bankruptcy, it filed a motion for relief, although, as we noted in the April Order, slip op. 1992 WL 77755 at *1, we were somewhat dismayed that it took no steps to invalidate the sale. Finally, requiring Prudential to resell the Property would entail certain additional expenses. However, if Prudential is oversecured, *see* pages 1010–12 *infra,* these expenses can be passed on to the Debtor. Finally, as we specifically found in the April Order and reaffirm, there was no encouragement of Prudential's actions by the

---

**3.** Needless to say, the presence of any one of these factors is not necessarily determinative, and the presence of the last factor listed above, without more, never is. Any time a creditor is required to repeat a collection effort, it will incur expenses. This factor is therefore not, without more, a sufficient reason to sanction a violation of the automatic stay by annulling the stay. In-

deed, a creditor which violates the stay may well find itself faced with a very difficult type of "sanctions," as well as increased expenses.

**4.** As noted above, however, the second bankruptcy was dismissed due to a technicality, *i.e.,* the Debtor's failure to file a matrix.

Debtor, and the Debtor did not engage in any "tactical, contrived maneuvers" akin to the debtor in *Albany Partners, supra.*

Thus, as we postulate above, if the Court did conclude that the facts of this case might warrant annulling the stay if the requirements of § 362(d)(2) were met, certainly a case can be made that this is one of the rare examples where annulling the stay may be appropriate. We must therefore turn our attention to the evidence presented by the parties at both the original hearing on Prudential's Motion I on April 9, 1992, and the consolidated hearing two years later on April 5, 1994, on the issues raised by § 362(d)(2), and take into account any relevant intervening developments in determining whether Prudential is entitled to annulment from the stay at this juncture.[5]

b. *Proof of either of the dual requirements of 11 U.S.C. § 362(d)(2) has not been provided by Prudential.*

■ The Court has expressly directed this court to determine whether the prerequisites of 11 U.S.C. § 362(d)(2),[6] which provides as follows, have been met here:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

. . . . .

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; *and*

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2) (emphasis added).

■ Per the word emphasized above, there is no question that § 362(d)(2) provides on its face that a movant must satisfy the requirements of both subsection (A) and subsection (B) of § 362(d)(2) if it is to succeed on a motion for relief from the automatic stay which is premised on that section.[7] *See, e.g., United Savings Association of Texas v. Tim-*

---

**5.** We reemphasize that we do not mean to suggest, nor do we believe that the Court meant to suggest, that any creditor who would have been entitled to relief from the stay if it had sought such relief at the time of its actions will have the stay annulled after the fact. Indeed, it is and should remain very risky business for any creditor to act in violation of the stay or hesitate to undo actions taken innocently in violation of the stay. *See Pinetree, supra,* 876 F.2d at 38 (although the court annulled the stay under the facts of the case before it, it noted that "[a] creditor ordinarily runs a serious risk of violating the automatic stay and subjecting itself to damages as well as the nullity of its action . . . if . . . it decides to foreclose and seek adjudication of title afterward."). Thus, proving entitlement to relief under § 362(d) is only the first step on the very long road a creditor must travel if it is to convince a court to annul a stay.

**6.** We do not consider whether Prudential would have been entitled to relief from the stay for cause pursuant to 11 U.S.C. § 362(d)(1). Prudential did not rely on this basis at either hearing addressing its Motion I. Also, the mandates of the appellate courts directed us to consider § 362(d)(2) grounds only.

**7.** There are certain older cases which have held that the § 362(d)(2)(B) element is not applicable in a Chapter 13 case and therefore relief cannot

be obtained by a creditor under § 362(d)(2) in a Chapter 13 case. *See, e.g., In re Branch,* 10 B.R. 227 (Bankr.E.D.N.Y.1981); *In re Youngs,* 7 B.R. 69 (Bankr.D.Mass.1980); *In re Feimster,* 3 B.R. 11 (Bankr.N.D.Ga.1979). *See also In re Fischer,* 136 B.R. 819, 825 (D.Alaska 1992). The better rule, followed by most courts, including the bankruptcy courts of this district, is that, if a creditor satisfies both prongs of § 362(d)(2), it may be granted relief from the automatic stay in a debtor's Chapter 13 case. "[W]e reject debtors' contention that the terms of § 362(d)(2) do not apply in Chapter 13 cases. Although courts have split on this issue, courts from our district have consistently allowed application of § 362(d)(2) in the Chapter 13 setting." *In re Kehm,* 90 B.R. 117, 121–23 (Bankr.E.D.Pa.1988) (Twardowski, J.). *Accord In re Crompton,* 73 B.R. 800, 811–12 (Bankr.E.D.Pa.1987); *In re Henderson,* 21 B.R. 285, 286 n. 7 (Bankr.E.D.Pa. 1982) (Goldhaber, J.); *In re Roselli,* 10 B.R. 665, 667 (Bankr.E.D.Pa.1981) (Goldhaber, J.). *See also In re Leonard,* 151 B.R. 639, 645–46 (Bankr. N.D.N.Y.1992); *In re Rodebaugh,* 12 B.R. 81 (Bankr.D.Me.1981). *Cf. Grundy Nat'l Bank v. Stiltner,* 58 B.R. 593, 596 n. 1 (W.D.Va.1986) ("'[A]n irrebuttable presumption is created in a Chapter 13 case as to the debtor's home as necessary to effective reorganization where the debtor's primary purpose in filing the Chapter 13 petition is to save his home."). The Court, in applying § 362(d)(2) to the instant facts, implicitly rejects the first line of cases.

bers of *Inwood Forest Associates, Ltd.,* 484 U.S. 365, 375, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988) ("[Section 362(d)(2) ] provides that the court shall grant relief 'if ... (A) the debtor does not have an equity in such property [*i.e.,* the creditor is undersecured] *and* (B) such property is not necessary to an effective reorganization' ") (emphasis added by the Supreme Court); *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 156 (3rd Cir.1993) ("The debtor stipulated that it had no equity in the property, and therefore the critical question was whether the property was 'necessary to an effective reorganization.' "); and *Nazareth Nat'l Bank v. Trina–Dee, Inc.,* 731 F.2d 170, 171 (3rd Cir.1984) (if a creditor meets its burden under subsection (A) and debtor fails to show that the property is necessary for an effective reorganization under subsection (B), then relief is appropriate).

We mention this point to avoid any confusion which may be caused by that portion of the Court's Opinion which states "we will remand this case to the bankruptcy court to determine whether this case meets the conditions of 11 U.S.C. § 362(d)(2)(A) *or* (B)." *Siciliano I,* 13 F.3d at 751 (emphasis added). We do not think that the Court intended to depart from the great weight of authority cited above, including earlier Third Circuit opinions, by interpreting § 362(d)(2) as only requiring proof of either the elements of subsection (A) or those of subsection (B). Indeed, earlier in the *Siciliano I* Opinion, the Court correctly sets forth the § 362(d)(2) relief standard. *Id.* ("This provision clearly indicates that under the conditions prescribed in subsection (d)(2)(A) *and* (B), the bankruptcy court *shall* grant relief from the automatic stay. . . .") (first emphasis added). Any interpretation of § 362(d)(2) which equates "and" with "or" would be contrary to both the unambiguous language of the statute and the Supreme Court's holding in *Timbers.* We believe that, in the sentence it utilized "or," the Court was merely giving us a directive to determine whether either § 362(d)(2)(A) or § 362(d)(2)(B) is not satisfied, in either of which cases granting relief on the basis of § 362(d)(2) would be inappropriate.

We acknowledge that the Court emphasized § 362(d)(2)(A) and suggests that the Debtor's equity or lack of equity in the Property is a necessary inquiry for this court on remand. *Siciliano I,* 13 F.3d at 751–52. However, nowhere does the Court state directly that Prudential is entitled to relief if this element alone is proven. The element of § 362(d)(2)(A) is, at best, one of the issues to consider to determine whether annulment is appropriate.

■ Also worthy of comment is the Court's emphasis on the word *shall* in § 362(d), *Siciliano I,* 13 F.3d at 751, which could be read as a suggestion that relief from the automatic stay *must* be granted if the elements of § 362(d)(2) are satisfied. Such a ruling would be contrary to the well-established principle that, even when the requirements of § 362(d)(1) or § 362(d)(2) are satisfied, a bankruptcy court may, in its discretion, withhold relief from the automatic stay. *See In re Colonial Center, Inc.,* 156 B.R. 452, 459 (Bankr.E.D.Pa.1993), and numerous cases cited therein. Again, we note that the Court, in *Siciliano I,* was not addressing relief under § 362(d) generally, but merely the criteria which this court should utilize in reconsidering the issue of determining whether to annul the automatic stay. The Court believed, apparently in view of the presence of several of the other pertinent factors in determining whether annulment was proper, that reconsideration of this issue was appropriate.

One thing is perfectly clear. Both the Court and the District Court wished us to make a § 362(d)(2)(A) analysis on the basis of an expanded record. We therefore are required by their mandate to do so.

The first point which we must make as a result of this analysis is that the evidence presented regarding the value of the Property was inconclusive. We also cannot determine, with any degree of certainty, the amount of the secured debt encumbering the Property, although we believe we can at least define the neighborhood of this figure. The Debtor, who has disputed Prudential's calculation of the amount due under his loan all along, seemed willing to concede to Pruden-

tial a $23,500 claim figure by the end of the hearing of April 5, 1994. Notes of Testimony, Hearing of April 5, 1994 ("N.T."), at 127. Moreover, it appears that there is a second mortgage encumbering the property in an amount not less than $7,000.

We acknowledge that the Court estimated the secured debt on the Property at $37,500. However, there was no testimony supporting this figure at the April 5, 1994, hearing. In fact, the testimony of a Prudential officer at that hearing fixed its debt at $23,273 in January, 1992, as opposed to the $27,500 estimate which it provided at the April, 1992, hearing. No evidence regarding the second mortgage was provided and we are reluctant to adopt the $10,000 figure estimated by Prudential at the 1992 hearing.

■ It was incumbent upon Prudential to prove both the amount of its debt. *See In re Grant Broadcasting of Philadelphia, Inc.,* 75 B.R. 819, 522–23 (E.D.Pa.1987). We can only conclude from the foregoing that the total secured debt against the Property is approximately $23,500 plus $7,000, or about $30,500.

■ Thus, Prudential bore the burden of proving that the value of the Property was less than that total of approximately $30,500 in order to show that the Debtor had no equity in the Property. *See* 11 U.S.C. § 362(g)(1). The *pro se* Debtor provided no evidence except his own estimate of value which, while admissible into evidence, *see In re Blakey,* 76 B.R. 465, 469, *modified on other grounds,* 78 B.R. 435 (Bankr.E.D.Pa. 1987), is hardly conclusive.

The foregoing circumstance appeared to present a best case scenario to Prudential to overwhelm the Debtor's evidence. However, Prudential badly missed its opportunity to do so.

■ Prudential's valuation expert was Ludwig Capozzi, a real estate agent who is conversant with the real estate in the South Philadelphia area where the Property is located. However, Capozzi is not in any way certified as an appraiser. He valued the Property at $23,000 to $24,000 in 1993, and at $20,000 today, characterizing the Property as

a "shell" or a "rehab" in need of $10,000 to $15,000 worth of repair work.

·However, this conclusion was based on Capozzi's assumption that the roof, electric, plumbing, and heating systems of the Property were likely to be faulty, an assumption which Capozzi could not substantiate and the Debtor credibly contradicted. Capozzi's evaluation was based largely on exterior inspection of the Property. He admitted that he had never examined its interior. He stated that he had only entered the Property on one occasion, and then only made it as far as the first room, where he was engaged by the Debtor in a conversation regarding Prudential's "illegal acts," and then escorted out. Capozzi estimated this interior visit as occurring in winter 1993. The Debtor vigorously and again credibly testified that Capozzi's interior visit occurred in winter 1991. Capozzi also conducted what he termed a "drive by" examination of the Property prior to the April 5, 1994, hearing wherein he only observed, presumably from the street, the front and back of the Property.

Capozzi's characterization of the Property as a shell and estimate of repairs needed was therefore derived almost exclusively from exterior inspection. The Debtor, who claimed to have skills in rendering home improvements, explained that he was reluctant to make any cosmetic repairs to the Property because of Prudential's retention of title after the sheriff sale and his uncertainty regarding his responsibilities for such upkeep in the interim. He claimed that he could repair all of the Property's defects for $2,500.

Capozzi presented virtually no objective support for the calculation of his results. He did not perform any written appraisal. The writing on which he wrote his finding was a so-called "comparable search" which listed all transfers by which the present owners came into title on every house in the same block as the Property. Capozzi claimed that this document supported the conclusion that the Property was losing value because, *inter alia,* property values in the area were declining. N.T., at 33–34.

This testimony is, however, contradicted by the contents of the "comparable search" itself. The last transfer in January, 1992,

yielded $42,000. Except for the transfer of the Property in issue to Prudential, listed as for $3,700, the next to last transfer in which consideration is listed was in May, 1990, at $41,000. Two reported 1988 transfers yielded $29,000 and $15,000, respectively and a 1987 transfer was reported at $36,000. Transfers from 1983 through 1987 showed generally rising figures in the $21,500 to $30,000 range.

The Debtor testified that he had arranged a sale of the Property in 1991 for $41,900, and that its present value was no less than $39,500. The "comparable search" provided greater support for the Debtor's testimony than it did for Capozzi's testimony, which included a vague, unsupported, and unlikely claim that a nearby property in excellent condition will be sold for only approximately $33,000.

In most cases, even those involving residential realty, this court is typically presented with two written appraisals presented by certified appraisers, and it falls upon us to determine where the actual value lies between the poles established by the parties' dueling experts. In this case, however, the evidence presented by neither side fit this mold.

■ When a court is unable to establish whether there is equity in a debtor's property as a result of inconclusive valuation testimony, then it can only conclude that the movant has failed to meet its burden under § 362(d)(2)(A). *See In re Bialac,* 712 F.2d 426, 432 (9th Cir.1983) (bankruptcy court found that debtor had "potential equity" in the property and denied creditor's motion for relief. The Court of Appeals affirmed, noting that bankruptcy court's inability to determine with certainty that there was equity in the property meant that the creditor had not met its burden of proof under § 362(d)(2)A)). The weight of the evidence in this record supports the Debtor's estimate of value in the high $30,000's more so than Prudential's evidence of a $20,000 value. The $22,000 figure recited in *Siciliano I* was derived from Capozzi's testimony at the April, 1992, hearing. For the reasons stated herein, we cannot credit this testimony.

From the foregoing, we cannot discount the possibility that the Debtor, as he claims, has equity amounting to nearly $10,000 in the Property. Prudential has therefore failed to meet its burden of proving that the Debtor does not have equity in the Property under § 362(d)(2)(A).

■ Since the mandates of the Court and the District Court focus on the requirement of § 362(d)(2)(A), and we can rather easily conclude that Prudential has not met the requirement, we need devote little attention to whether Prudential has also met the requirements of § 362(d)(2)(B). However, we note that the fact that the Debtor is admittedly striving to maintain a residence and avoid homelessness in itself strongly suggests that there is some necessity to the Debtor's retention of the Property. *See, e.g., Grundy Nat'l Bank v. Stiltner,* 58 B.R. 593, 595–96 & n. 1 (W.D.Va.1986); *In re Purnell,* 92 B.R. 625, 631 n. 11 (Bankr.E.D.Pa.1988) (Fox, J.); and *In re Crompton,* 73 B.R. 800, 811–12 (Bankr.E.D.Pa.1987).

Most courts, including this court, in analyzing § 362(d)(2)(B), even in the Chapter 13 context, have focused upon the effectiveness of the Debtor's reorganizational prospects, as well as its necessity of a home's retention to the Debtor's well-being. *See In re Crompton, supra,* 73 B.R. at 811–12. *Cf. Timbers, supra,* 484 U.S. at 375–76, 108 S.Ct. at 632–33 (holding, in a business context, that an analysis of the effectiveness of a debtor's proposed reorganization is crucial to § 362(d)(2)(B)).

It is somewhat difficult for Prudential to argue that the Debtor was incapable of achieving an effective reorganization in light of our subsequent conclusion that, in the 4th Case, he has had a plan confirmed and that Prudential's efforts at revoking confirmation fall short of the mark. *See* pages 1013–15 *infra.* These developments subsequent to the formulation of the record before the Court were apparently unknown to the Court and, if known, could have influenced its decision. On the other hand, the ultimate effectiveness of the Debtor's confirmed plan in dealing with Prudential is doubtful. *See* page 1017 *infra.*

From the foregoing, we conclude that it is certainly doubtful whether Prudential met or can meet the § 362(d)(2)(B) requirement. This analysis adds further negative weight to Prudential's failure to meet the § 362(d)(2)(A) requirement which the appellate courts' mandate rendered significant. We therefore conclude, with very little hesitation, that full consideration of the elements of § 362(d)(2) does not support the extraordinary annulment relief sought by Prudential. On remand, we therefore reiterate our previous conclusion that Prudential's Motion I must be denied.

## 2. THE DEBTOR'S MOTION MUST CLEARLY BE DENIED BECAUSE THE EVIDENCE DOES NOT SUPPORT ANY RELIEF AND BECAUSE IT ATTACKS A NON-EXISTENT CLAIM OF PRUDENTIAL.

 Having prevailed in Prudential's Motion I and being entitled to have the Property reconveyed to him is a significant victory for the Debtor, but it hardly brings him home free. As we analyze the Debtor's Motion, the inability of his plan in the 4th Case, even if confirmed, to resolve his differences with Prudential, begins to become manifest.

The homespun Motion, analysis of which is hampered by the absence of a prayer for relief or any hint of what relief is sought should this Motion prove to be successful, appears to be in the form of an objection to a hypothetical secured claim of Prudential and/or a lender liability action.

 We hesitate to dispose of the Debtor's Motion brusquely. Because the Debtor is a *pro se* litigant, we are careful to weigh the merits of his positions, even if presented in a haphazard fashion. *Cf. In re Data Tech Industries, Inc.,* 1992 WL 37500, slip op. at *3 n. 2 (Bankr.E.D.Pa. Feb. 21, 1992) (a *pro se* defendant's failure to formally plead affirmative defense excused); and *In re Henderson,* 134 B.R. 147, 151 (Bankr.E.D.Pa. 1991) (a debtor effectively acting *pro se* was permitted to file a "less formal submission" than his opponent). However, our sympathies for this *pro se* party are running thin in light of his constant refusal to obtain counsel, especially when he stated that his union would provide him with an attorney for free, but that he was dissatisfied with the quality of representation. Even the least skillful of lawyers could almost certainly provide critical technical assistance to this Debtor. As we stated in *In re Holmes,* 1992 WL 96338, slip op. at *2 (Bankr.E.D.Pa. April 28, 1992), debtors cannot be permitted to "delay [a creditor's] enforcement of its rights during the period that they thrashed about without counsel."

Our sympathies are also diminished by the observation that the Debtor's claims are barred by *res judicata* in light of the uncontested State Court mortgage foreclosure judgment against him. The Debtor has effectively claimed that Prudential and Balka attempted to charge him $1,200, which he deems excessive fees, inconsistent with Prudential's earlier agreement with him, as a condition to cure his mortgage in 1989. Parenthetically, we note that, if a deposit were paid by Prudential to the sheriff to advertise the Debtor's Property for sale, $1,200 may well have consisted mostly of out-of-pocket costs and not be excessive at all. However, what is indisputably clear is that these purported violations of 41 P.S. §§ 403, 404, 406 in servicing the Debtor's mortgage, *see* page 1003 *supra,* had to be raised in the State Court foreclosure action or they were lost. *See Werts v. Federal Nat'l Mortgage Ass'n,* 48 B.R. 980, 984–85 (E.D.Pa.1985); and *In re Garafano,* 99 B.R. 624, 629–34 (Bankr. E.D.Pa.1989).

 Furthermore, we note that neither Prudential nor the Debtor on its behalf has filed a proof of claim in the 4th Case. Thus, to the extent that the Debtor raises these contentions in the form of an objection to Prudential's proof of claim, the absence of a claim renders such an action impossible. *Cf. In re Dembo,* 126 B.R. 195, 197–200 (Bankr. E.D.Pa.1991) (a proof of claim must be filed before a debtor may attack the claim under 11 U.S.C. § 506). The inability of the Debtor's plan to treat Prudential's claim has, as we will later note, other serious repercussions as well. *See* page 1017 *infra.*

All of the foregoing causes us, without any hesitation, to deny the Debtor's Motion.

3. *PRUDENTIAL'S MOTION II MUST ALSO BE DENIED, PARTICULARLY BECAUSE PRUDENTIAL HAS NOT MET THE DEMANDING STANDARDS NECESSARY FOR REVOCATION OF CONFIRMATION, AND A VALID CONFIRMATION OF THE DEBTOR'S PLAN RENDERS PRUDENTIAL'S "BAD FAITH" CLAIMS INEFFECTUAL.*

■ Prudential's Motion II, seeking relief in the 4th Case, as supported by its Memorandum, proffers two arguments outlined at pages 1005–06 *supra,* which we will summarize here as (1) a claim that the 4th Case was filed in bad faith; and (2) a contention that the relief for the automatic stay granted to Prudential in the Debtor's first case is *res judicata* in his 4th Case.

In its submissions, Prudential has virtually ignored the fact that the 4th Case has produced a confirmed plan. Moreover, Prudential has provided no excuses whatsoever for its failure to monitor, participate in, and timely raise many of the issues articulated in Prudential's Motion II at earlier, critical junctures in the 4th Case. Balka's entry of appearance in the 4th Case eight days after its filing make it clear that this Case was in Prudential's sites since its outset. It is difficult to reward such spectacular lack of diligence.

■ We cannot ignore the Order confirming the Debtor's plan in the 4th Case. We do note the Prudential's Motion II was filed just inside the 180–day period after the Debtor's plan was confirmed in which Prudential could seek to revoke our confirmation of the Debtor's plan pursuant to 11 U.S.C. § 1330(a). We do note, however, that technically, such relief is properly sought only by the filing of an adversary complaint, and not by motion. *See* Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7001(5). *See also In re Pence,* 905 F.2d 1107, 1109 (7th Cir.1990); and *In re Szostek,* 93 B.R. 399, 403 n. 6 (Bankr.E.D.Pa.1988) ("*Szostek I*"), aff'd, 886 F.2d 1405 (3rd Cir.1989) ("*Szostek II*"). Not only has Prudential not filed the requisite complaint, but also it has not even requested, in Motion II, that confirmation be revoked. Therefore, it appears that Prudential has

failed to meet the 180–day deadline of § 1330(a) and that the confirmation Order is now impregnable to attack. This deficiency is rendered even more inexcusable and puzzling because, at the colloquy on February 8, 1994, prior to the running of the 180–day period, this court expressly raised the issue of the probable necessity of Prudential to invoke § 1330.

■ Assuming *arguendo* that Prudential's Motion II could be deemed as a § 1330 motion, we also find that grounds for relief under § 1330 have not been made out. Section 1330(a) provides as follows:

> On request of a party in interest at any time within 180 days after the date of the entry of an order of confirmation under section 1325 of this title, and after notice and a hearing, the court may revoke such order *if such order was procured by fraud* (emphasis added).

■ Although § 1330 fraud is not defined in the Bankruptcy Code, the courts have adopted a common law fraud analysis when applying this section. *See Szostek I, supra,* 93 B.R. at 403. Thus, a party seeking to revoke a Chapter 13 confirmation order must show: (1) that the debtor made a materially false statement; (2) that the debtor knew that the statement was materially false or that he made the materially false statement in reckless disregard for its truth; (3) that the debtor intended the court to rely on the materially false statement; (4) that the court did rely on the materially false statement; and (5) that as a result of the court's reliance, the confirmation order was entered. *Id.;* and *In re Edwards,* 67 B.R. 1008, 1009–10 (Bankr.D.Conn.1986).

■ Although fraud may be proved by circumstantial evidence, it is never presumed. *Edwards, supra,* 67 B.R. at 1011. The standard of proof for § 1330 fraud also appears to be the classic, demanding standard of establishing fraud by clear and convincing evidence. *In re Scott,* 77 B.R. 636, 638 (Bankr.N.D.Ohio 1987). This is a very heavy burden to shoulder in the best of circumstances, *see generally Szostek I, supra,* 93 B.R. at 403 ("the difficulties inherent in showing fraud result in few such findings

under § 1330 ...; indeed my research reveals very few cases in which revocation was deemed appropriate under § 1330(a)").

Prudential offered virtually no evidence of facts on the basis of which we could impute fraud on the part of the Debtor. In a colloquy near the end of the April 5, 1994, hearing, Balka suggested that Prudential may have made out a case under § 1330 by noting the Debtor's testimony regarding his income and the inconsistencies between that testimony and certain information contained in the Debtor's Schedules. N.T., at 165–66. We are not convinced that these alleged discrepancies are evident, or that they are, even if evident, sufficiently material to prove fraud on the part of the Debtor by clear and convincing evidence. Balka referenced only the fact that the Debtor estimated his 1993 income at $15,000 to $18,400 at trial, while, according to the Debtor's Schedules, his 1993 earnings were projected at only $8,000. We note, however, that the Plan, which was filed on the same day as the Debtor's Schedules, indicates that the Debtor's income is in the range of $18,000 to $19,000 per year. Thus, it seems very possible that the Debtor wrote $8,000 for his earnings when he meant to write $18,000. And, even if he did not make such an error, the significance of this discrepancy is *de minimis.*

It is therefore apparent that Prudential cannot attack, or at least has not attacked, in timely or effective fashion, the Order confirming the Plan.

█ Having failed to successfully attack the Order confirming the Plan, Prudential is confronted with the finality of the Debtor's confirmed Plan, an issue discussed by the Court of Appeals at length in *Szostek II, supra,* 886 F.2d at 1408–10. In sustaining the power of confirmed plans to bind the parties, the *Szostek* court states as follows:

"it is quite clear that the binding effect of a chapter 13 plan extends to any issue actually litigated by the parties and any issue necessarily determined by the confirmation order, including whether the plan complies with sections 1322 and 1325 of the Bankruptcy Code. For example, a creditor may

not after confirmation assert that the plan was not filed in good faith, ... that the creditor should have been paid interest; that the debtor is ineligible for chapter 13 relief; or that the plan is otherwise inconsistent with the code in violation of Section 1322(b)(1) or section 1325(a)(1)," [quoting] 5 Collier on Bankruptcy, ¶ 1327.01 (15th ed. 1988).

The major thrust of Prudential's Motion and Memorandum is precisely the sort of assertion that the Debtor's Plan was not filed in good faith which the *Szostek II* Court expressly states is foreclosed by the confirmation Order.

Moreover, later developments in the *Oglesby* case cited by Prudential in support of the argument that the 4th Case could have, at an earlier stage, been stricken as a bad faith filing, suggest that this argument has little merit. On remand from the *Oglesby I* decision cited by Prudential, this court filed an Opinion reported as *In re Oglesby,* 161 B.R. 917, 923–24 (Bankr.E.D.Pa.1993), *aff'd,* C.A. 94–0617 (E.D.Pa. April 7, 1994) ("*Oglesby II* "),[8] in which we found that the *Oglesby* debtor's case could not properly be dismissed for "bad faith."

█ Therein, we reiterated our previous conclusion that, contrary to the reasoning of *Huerta, supra,* the other authority heavily relied upon by Prudential, there is no "good faith" filing requirement, specifically in Chapter 13 cases. *Id.* at 923–24. *Accord, Johnson v. Home State Bank,* 501 U.S. 78, 87, 111 S.Ct. 2150, 2156, 115 L.Ed.2d 66. The only good faith requirement for Chapter 13 cases is set forth in 11 U.S.C. § 1325(a)(3), requiring that a Chapter 13 plan be filed in good faith. Any argument that the Debtor's Plan was filed in bad faith falls with our conclusion that confirmation of the Plan cannot be revoked. Moreover, the requisite elements of § 1325(a)(3), *i.e.,* deliberate misinformation of the court and other dishonest acts or acts inconsistent with Bankruptcy Code requirements, *Oglesby II, supra,* 161 B.R. at 923–24, on the part of the Debtor have not been proven by Prudential.

---

**8.** This affirmance was by the same district judge who had written *Oglesby I.*

Thus, we easily conclude that Prudential's attack on the Debtor's filing as a breach of good faith is both untimely and misplaced, especially at this post-confirmation juncture.

■ We also noted, in *Oglesby II,* 161 B.R. at 924, that a bankruptcy court is not powerless to address abuses effected by bankruptcy recidivists. The bankruptcy courts have many other tools at their disposal for preventing abuses of the Bankruptcy Code. *See* F.R.B.P. 9011; and *In re Narod,* 138 B.R. 478, 481–82 (E.D.Pa.1992). We therefore shall invoke some of these tools and the request by Prudential that any future filings by the Debtor be curtailed in formulating that aspect of our Order which provides directives to the parties for the future.

■ As an alternative to a dismissal of this case on the ground that the Debtor is proceeding in bad faith, Prudential seeks relief from the automatic stay on the ground of *res judicata.* Prudential's entire argument in its Memorandum on this issue is a large block quote from *Huerta, supra,* 137 B.R. at 373–74, which discusses and incorporates in turn the decision in *In re Abdul–Hasan,* 104 B.R. 263 (Bankr.C.D.Cal.1989). The *Abdul–Hasan* case held that an order for relief from the automatic stay entered in one case is *res judicata* in a subsequent case filed by the same debtor. *Id.* at 267.

Similarly, Prudential argues that the relief from the stay order entered in its favor during the Debtor's first bankruptcy is *res judicata* in the 4th Case. There is some other support for Prudential's position. *See, e.g., In re Taylor,* 116 B.R. 728, 730 (Bankr. E.D.Cal.1990); and *In re Bystrek,* 17 B.R. 894, 895–96 (Bankr.E.D.Pa.1982).

■ The leading decision addressing this issue in the Eastern District of Pennsylvania has, however, rejected Prudential's argument. *In re Norris,* 39 B.R. 85, 87 (E.D.Pa. 1984). *Accord, In re Taylor,* 77 B.R. 237, 240 (9th Cir. BAP 1987), *aff'd in part & rev'd in part on other grounds,* 884 F.2d 478 (9th Cir.1989). In *Norris,* the district court reviewed a bankruptcy court order granting prospective relief from any subsequent stay and held that "a bankruptcy judge in a pending proceeding simply does not have the power to determine that the automatic stay shall not be available in subsequent bankruptcy proceedings." 39 B.R. at 87. This is certainly the case when, unlike the facts in the *Abdul–Hasan* case, 104 B.R. at 268, the dismissal which precedes the debtor's subsequent bankruptcy is involuntary.

■ In any event, even where a judgment or order may be entitled to *res judicata* effect, the party asserting its effect must show that the cause of action and the parties are identical and that the original judgment or order was a final, valid disposition on the merits. *See, e.g. In re Martinez,* 123 B.R. 158, 159 (Bankr.D.P.R.1991); and *In re Laubach,* 77 B.R. 483, 485 (Bankr.E.D.Pa.1987), and cases cited therein. Prudential has failed to meet its burden of showing that the causes of action raised in each of these motions are identical. Much has passed between the parties between 1991 and the present which renders their circumstances vis-a-vis one another quite different than in 1991.

■ Other weaknesses in Prudential's argument in this case hark back to the instant status of the 4th Case, in light of confirmation of the Plan. After confirmation, a showing that the debtor has violated the terms of the plan itself is generally necessary to obtain relief. *See In re Owens,* 132 B.R. 293, 297 (Bankr.E.D.Pa.1991); and *In re Smith,* 104 B.R. 695, 699–700 (Bankr.E.D.Pa.1989). Finally, we note that, if the *res judicata* argument were really believed by it to be valid, it is difficult to understand why Prudential did not raise it in reference to its Motion I, as early as at the hearing on April 9, 1992, and attempt to avoid an exercise which ended up at the Court of Appeals. We think Prudential's earlier actions therefore betray its conviction regarding the lack of strength of this *res judicata* argument.

We therefore conclude that Prudential's Motion II, in its present form, must be denied in its entirety.

4. *THE FUTURE OF THE PARTIES' RELATIONSHIP AND THE 4TH CASE (AND WHAT IS PROBABLY A FINAL WARNING TO THE DEBTOR).*

■ Certain results of our foregoing decisions are clear. The 2nd Case may be laid

to rest and buried with the Debtor's first and third bankruptcy cases. Prudential must reconvey the Property to the Debtor. Although this result may seem so inevitable as to not require its direction per an Order, we think a directive in the Order is necessary for two reasons: (1) Prudential failed to act after the April Order, which should have had the same effect; and (2) a deadline, imposed here as May 16, 1994, is necessary to impose stability on the parties' future relationship so that they can move on.

■ Once the parties' relationship of mortgagor and mortgagee is restored, the Debtor must tend to the gaping deficiencies in the Plan, or his ultimate goal of retaining the Property will be doomed. The present Plan fails to deal with Prudential or its potential claim at all. Although a debtor is permitted to deal with a secured claim outside of its plan, such a claim cannot be modified or attacked within the bankruptcy case, and the secured creditor obtains the same treatment of his claim to which it would otherwise be entitled in a non-bankruptcy setting. Thus, the debtor runs the risk that the secured creditor will easily secure relief from the stay in order to pursue its state court remedies upon the slightest default of the debtor. *See, e.g., In re Evans,* 66 B.R. 506, 510 (Bankr.E.D.Pa.1986), *aff'd,* 77 B.R. 457 (E.D.Pa.1987) ("Exercising the option to treat a secured claim 'outside' the Plan will not prejudice the secured creditor, who will retain his security and his unmodified claim despite the bankruptcy filing. Being dealt with 'outside' the Plan may make it quite easy for the secured claimant to obtain relief from the automatic stay, and hence proceed exactly as if there had been no filing."); and *In re Waldman,* 75 B.R. 1005, 1007–08 (Bankr.E.D.Pa.1987) (same). *See also* 5 COLLIER ON BANKRUPTCY, ¶ 1325.-06[2][b], at 1325–38 (15th ed. 1994) ("The holders of allowed secured claims not provided for by the plan may seek appropriate relief from the automatic stay in furtherance of any contractual or other remedies available against the Chapter 13 debtor or their collateral.").

The record is replete with testimony from Prudential's witnesses and admissions from the Debtor himself regarding the Debtor's inconsistent payment history; his failure to make any mortgage payments in 1994; and his failure to reduce Prudential's arrearages, much less cure them. Therefore, it is likely that we would grant Prudential relief from the automatic stay in order to reschedule a sheriff's sale of the Property and conclude its State Court proceedings unless the Plan is substantially modified to adequately provide for Prudential's claim.

We have little doubt that such a modification of the Plan could be successfully undertaken. *See, e.g., In re Witkowski,* 16 F.3d 739 (7th Cir.1994); *In re Gronski,* 86 B.R. 428, 432 (Bankr.E.D.Pa.1988); and *Evans, supra,* 66 B.R. at 511. An adversary proceeding or motion specifically addressing Prudential's claim may be necessary to attack it in any way, irrespective of an attempt to modify the claim in the context of a plan. *See Owens, supra,* 132 B.R. at 296–97. *But cf. In re Wolf,* 162 B.R. 98, 102–03 (Bankr. D.N.J.1993).

Our most recent encounter with the Debtor reinforces our initial impression, articulated in the April Order, that the Debtor is doomed to self-destruction if he attempts to proceed without counsel. Despite a rough charm and a practical perspective often lacking from Prudential's efforts, the Debtor has proven time and time again that he needs technical assistance to successfully grapple with the Bankruptcy Code. He appears to have the financial resources to hire counsel. Lacking same, he could apply for assistance from Community Legal Services, Inc. or the Consumer Bankruptcy Assistance Project (both at 893–5300).

We refrain from granting any relief to Prudential at this stage for two reasons. First, it has not asked for relief, in either of its Motions, on the ground that its claim is not dealt with by the Plan. Second, it is difficult to measure what effect its own retention of title to the Property has created to the Debtor. In all fairness to the Debtor, even had he known how to go about proposing, drafting, and obtaining confirmation of a plan which adequately dealt with Prudential's claim, it is unclear how he would have been

able to proceed to do so with title to the Property in the name of Prudential.

One final restraint upon the Debtor is, we believe, appropriate, given his stubborn and perhaps incurable penchant for recidivism. Prudential has already had to suffer through four Chapter 13 bankruptcies. Not all of this suffering has been at its own hands. The Debtor has had more than a fair chance to confirm a plan and begin his recovery, and he is herein given *one* more chance. If this chance is squandered, it would not be fair to make Prudential wait any longer in light of the Debtor's dismal chances of succeeding the next time if he has failed to do so four times before. Therefore, we will provide that, if this Case is dismissed, the Debtor will be precluded from making any further bankruptcy filings for 180 days after the dismissal without express permission from this court after notice to Prudential. *See Narod, supra,* 138 B.R. at 483–84.

## D. CONCLUSION

All of the foregoing matters and issues are addressed in the following Order.

### ORDER

AND NOW, this 5th day of May, 1994, after a consolidated hearing on April 5, 1993, to consider the Motions of Prudential Savings Bank ("Prudential") (1) to annul the stay in Bankr. No. 91–16378DAS ("Prudential's Motion I"), on remand, and (2) to consider the Motions of Prudential Savings Bank ("Prudential") to Dismiss Bankr. No. 93–12752, or in the Alternative, for Relief from the Stay ("Prudential's Motion II"), and to consider the Debtor's Motion to Prove Illegal Acts ("the Debtor's Motion") in that case, and upon consideration of the submissions of the parties hereto in support of their respective positions, it is hereby ORDERED AND DECREED as follows:

1. The denial of Prudential's Motion I is REINSTATED.

2. Prudential's Motion II is DENIED.

3. The Debtor's Motion is DENIED.

4. Prudential shall take all steps necessary to re-transfer the property in issue, 2027 South 24th Street, Philadelphia, Pennsylvania ("the Property") to the Debtor on or before May 16, 1994.

5. The Debtor shall file and serve any appropriate motion to modify his present, confirmed plan in a manner consistent with this Opinion and Order on or before June 1, 1994.

6. A hearing on any motion filed pursuant to paragraph five of this Order is tentatively scheduled, with a status hearing on both of the above cases, on .

TUESDAY, JUNE 21, 1994, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

7. If the Debtor's presently-pending Case is dismissed at any time, the Debtor shall be barred from filing any other bankruptcy case for a period of 180 days after the dismissal, unless express permission for a further filing is granted by this court after notice to Prudential, the Standing Chapter 13 Trustee, and the United States Trustee.